This is the last sitting before the holidays, so we wish everyone a good, healthy, and blessed holiday season. With that, we'll call the first case of the day, Rayford v. Wexford Health. Mr. Bent? Yes. Good morning. Good morning. May it please the court, I'd like to reserve three minutes for rebuttal. All right. Ladies and gentlemen, I'd like to bring to your attention a couple of issues. The first issue in front of the court is whether or not there is reasonable facts that a jury could infer from the circumstances surrounding Dr. Rayford's employment that would support our belief that the reason for not being hired as a site manager, a medical director position, is nothing but a pretext for discrimination. Now, with respect to understanding the situation a little bit better, if we look back over Dr. Rayford's employment, we'll find that he was employed by Wexford from approximately June of 2000 until July of 2005. During that time, there was absolutely no issue with respect to his employment. He wasn't formally disciplined. He wasn't told that he was going to lose his job if for any reason he failed to satisfy additional requirements placed on him by the employer. He essentially was laid off because the company lost the contract. Moving forward, Dr. Rayford expressed some of his concerns dealing with the layoff to the vice president of human resources, Elaine Gedman. And at that point in time, he had a telephone conversation with Ms. Gedman wherein he expressed some continuing concerns. And sometime during that conversation, which lasted about 15 minutes, he indicated that he felt that he was being treated unfairly, that he wasn't being treated similarly as other individuals. He proceeded to send some letters to various individuals, including politicians. And from there, he filed a lawsuit. He filed a lawsuit in 2008 indicating that he believed he was the victim of race discrimination. And where did these derogatory comments that he made about the company fall on the timeline? Yes, and so the derogatory comments that he expressed happened in July of 2005. And the derogatory comments that actually were articulated to Elaine Gedman occurred during the course of the scope of his employment. So with respect to the derogatory comments, and just so that we're clear, all of that happened in a telephone conversation in July of 2005. And then when were the letters? And the letters were sent sometime subsequent to that. I think between the August and the December time frame again in 2005. And later in December, it was December 2005 when they got the contract again, and he was not hired. Yes, that's correct. And that was the decision that was the subject of the 2008 lawsuit? That is correct. Okay. Could I quibble with you just a little bit? Sure. Mr. Benton, you said you thought you had evidence of pretext to support an inference of discrimination. I understood you to be pursuing only a retaliation claim. That is correct. Okay. Yes. So during the intervening time, Dr. Rayford files a lawsuit against the company. And he continues to seek employment, which is what he's required to do. He's mitigating his damages. So in November of 2007, he finds a job as a site medical director for CHC, also referred to as HPL. It's another medical care provider. They provide medical care for inmates. And the site medical director position is located in Vandalia, Illinois, the Vandalia Correctional Center. The significance of that is twofold, and we'll get to that here momentarily. But he works in this position as a site medical director, seeing patients throughout the day. His primary function is seeing patients. He's not in a managerial role. He doesn't hire employees. Counsel? Oh, I'm so sorry. Could you tell us what evidence we have in the record about the management demands on both a site director for Wexford and for a regional director for Wexford, and where we find that? Yes. With respect to the management responsibilities relative to the site medical director, Dr. Caldwell testified at deposition that the position required absolutely no management skills, no management responsibilities. He also testified that there were absolutely no responsibilities associated with hiring, firing, and disciplining employees. And I might add that he did not receive, Dr. Caldwell did not receive a job description as the site medical director for Vandalia when he was hired by Wexford. And what about the regional director? With respect to the regional medical director position, I believe that Dr. Rayford testified as to the responsibilities of the regional medical director. And I think his testimony indicates that he was responsible for supervising physicians as well as managing other individuals. So I guess to draw a distinction between the two, the regional medical director position required him to exercise management skills. It was purely a management position. And I think if you take it a step further, you will find that in addition to him exercising management responsibilities, he also had to interface with high-level individuals such as Elaine Getman. He would fly from his position in Illinois up to Pittsburgh to meet with Elaine Getman and other executives. How does any of that establish pretext? The reason that he wasn't hired for the medical director position was because he was trashing the company. Yeah. So the statement that was articulated by the company was that Dr. Rayford wasn't hired as the site medical director because he lacked management skills. And the management skills go back to the issue of what function he performed as a site medical director. The thing is, though, he wasn't hired as a medical director. But when you're trying to make this kind of claim, we do have to take into account he was offered another job in an independent position at the prison, wasn't he? Yes. I would certainly agree with that. And we do have to take that into consideration, and I think that goes toward the issue of pretext. It goes to the issue of pretext because the position that he was offered, it was an independent contractor position. It was not defined in terms of having a definite location where he was going to work. It was less benefits. So it wasn't at the prison. That independent physician position was not at that prison. Is that what you're saying? It wasn't defined. It wasn't defined exactly. That's right. I have no idea, and I don't think it's been articulated as to where he was going to be. And the other part of that and the reason why it is significant and goes to the issue of pretext is that position, that offer, that elusive offer, it was withdrawn when Dr. Rayford asked for a written explanation as to why he wasn't given the site medical director position. Well, I thought he testified that he turned down the position. Well, and I think there's some distinctions with respect to that. I think that Dr. Rayford initially said he wasn't interested in that position. He was interested in the site medical director position because, again, he was qualified for that job. He held that position for CHC for approximately five years, and he wanted to know why he wasn't offered the job. And it was at that point in time when he asked for a written explanation as to why he wasn't given the job. That is when the offer was withdrawn. Now, the gentleman who replaced him was Dr. Caldwell. He was also African-American. Yes, he was also African-American. And if you look and compare the two, Dr. Caldwell certainly didn't have any management skills. If you look at the fact that the interview, he's interviewed for the position by Wexford. This is the retired colonel? This is the retired colonel. And during the interview, there was absolutely not a single question asked of Dr. Caldwell as to his management skills. In fact, Dr. Caldwell characterized the interview as being perfunctory, that it was a waste of time, that the person interviewing him was talking in circles. He goes on to say that he felt that Wexford was just looking for warm bodies. And when you look at the facts, it certainly supports that position, that they were just looking for warm bodies because Dr. Caldwell's first assignment was at Menard Correctional Facility. And at Menard, it's a maximum security prison. We see a lot of prison cases involving inadequate health care from Wexford and others. Sure. And the significance of him going to Menard is when he got down there, he said, no, I don't want this job. He doesn't want it because he finds or believes that there is a female employee that's fresh out of medical school that's getting paid more. So Wexford doesn't say, I tell you what, you know, it's time for us to part our ways. They decide, well, I tell you what, maybe we can work with you someplace else. He goes up to Vandalia Correctional Center and is offered the site medical director position there. And it's at that time that he further demonstrates that he doesn't have the requisite management skills. If you want to save some time for rebuttal. Yes. All right. Thank you. Thank you, Mr. Fenton. Ms. Baker Seal. May it please the Court. My name is Denise Baker Seal and I represent Wexford Health Sources. The decision of the district court was appropriate and correct, and this court can affirm that decision on three bases. One, the plaintiff's proof fails because he cannot prove causation. He cannot prove that the decision of Wexford not to hire him for the Vandalia Correctional Center site medical director position was a result of the previous lawsuit. As the court's questioning has illustrated, the facts that led to that decision occurred before the decision. It also supported a previous decision of Wexford. Wexford has made this decision not once but twice. They made the same decision not to bring Dr. Rayford back into a site medical director position before the previous lawsuit was filed. For that reason, he cannot establish causation. The second reason that the lower court's decision should be affirmed is because plaintiff cannot establish a prima facie case under the McDonnell-Douglas burden shifting analysis. He cannot establish that there was a similarly situated employee that was treated differently. The only employee offered by Dr. Rayford as a similarly situated employee is Dr. Caldwell. He is not similarly situated. He did not make negative comments about the company. He did not write negative letters to those outside of Wexford. He just sounded off in his deposition, right? That's certainly the most unusual feature in this case. That is correct, Your Honor, and his conduct was completely inappropriate. What was it that provoked his comment about the judge? It was a question about, I apologize, I don't remember specifically, but it was a question that he did not want to answer, and counsel indicated to him that if he didn't answer the question, we would go to the court and ask for an order compelling him to answer, and then he made that statement. Okay. And he was a colonel. How did his credentials compare to Rayford? Well, first and most significantly, he did not hold a negative belief about Wexford. Right, I understand that. Secondly, he did have management skills. He had been a private physician for 30 years, operating his own private practice. He had been a colonel in the Army, as the court has pointed out. He also had served in the capacity as a prison physician in Missouri in another facility, so he had those skills as well. Counsel focuses on the interview. And how recently had he been in a prison? Because you outlined in your brief the minimum security jail as well as the Army. Timing-wise, when was that? He was still on call at the other prison at the time he was hired by Wexford. So he still had that position, although it wasn't on a full-time basis, and he had held that for several years before then. Thank you. I'd also like to emphasize that the trial court's decision is appropriate also because plaintiff has utterly failed to prove pretext. He just simply can't, for many of these reasons that we've been discussing. The fact that Dr. Caldwell was not asked about his management skills during his interview is really not relevant. He did have management skills. He used those management skills in the position once he was assigned to Vandalia Correctional Center. I wanted to point out a couple of things in the record. What do we make, since it's up on summary judgment, of the testimony that Caldwell himself gave about not needing any management skills for this job? And I wanted to point that out, Your Honor. I believe that's an incorrect reading of the record. Dr. Caldwell does, in fact, articulate his management responsibilities. While it's true that he spends most of his day as a physician taking care of inmates, he had management responsibilities. He was responsible for overseeing the other medical staff at the facility. If necessary, he was responsible for disciplining them. He didn't have the opportunity. And that testimony is where, and is it undisputed? Yes, that is correct, and it is in Dr. Caldwell's deposition. Can you be more specific? I cannot point you to the exact page. I apologize, but it is cited directly in the brief. Thank you. In addition, the description of his responsibilities as site medical director of Vandalia is also in the record. The job description is attached to Sherry Loren's affidavit. That is attached to our motion for summary judgment as well. And that clearly indicates that as the top management person of Wexford at the facility, they had management responsibilities. He had the obligation and the responsibility of interacting with other members of Wexford management as well as interacting with Wexford's client, the Department of Corrections. He did this on a daily basis, and that's confirmed by both Dr. Caldwell's deposition testimony as well as the job description. And because he had these responsibilities, Wexford chose not to rehire Dr. Rayford. They did not want to put Dr. Rayford in a position where he would be required to interact with top-level Illinois management members that he criticized, that he didn't trust, that he didn't have a belief that he could work with. And it was for these reasons that Wexford chose not to hire him. But I want to emphasize the causation issue. I want to emphasize the causation issue. Wexford made the same decision before Dr. Rayford complained of discrimination or filed his previous charge of discrimination or filed his previous lawsuit. The same decision was made for the same reasons. It all stems from the July 2005 telephone conversation with Ms. Gedman. Ms. Gedman recalls at that conversation that Dr. Rayford criticized Wexford, that he spoke ill of them and their ability to care for inmates, and Dr. Rayford acknowledges that he criticized senior members of management. He was a top manager for Illinois for five years, and he held these feelings apparently and chose not to express them to more senior members of the Wexford team. Once he expressed these beliefs, Wexford rightly so questioned his ability to be a leader, to be a Wexford leader. He may have been a very good site manager for HPL, but he couldn't be a Wexford manager because he felt negatively about the company. Yeah, and there's nothing in the record that indicates he had any problem in those five years when he was a manager. That is correct. That is correct. He performed those duties satisfactory. Sherry Laurent does have some concern once he applies whether or not he was a good manager, but it was satisfactory. So once they were given the opportunity to determine whether or not to bring him back on, those considerations were made. Ms. Bakersfield, could I ask you a quick case management question? Absolutely. Did I read correctly that summary judgment here was granted four days before trial was supposed to begin? That is correct, Your Honor. Is that unusual in the Southern District? It seemed unusual to me. It was very close in time to the trial, but I'm not certain. I know at least one other district has a practice of saying if it's not resolved 30 days before trial, the trial goes off. Is there a similar practice in the Southern District? Not that I'm aware of, Your Honor. I assume you both spent a lot of time preparing for trial. We did. We were very close to trial. In fact, I was actually with the client out of town when we received word of the motion. Absolutely. I want to reemphasize my second point. Just to follow up on what Judge Hamilton said, was there any request made by the parties of the court to continue the trial given that the summary judgment motion hadn't been ruled on? No, there was no request for continuance. Both Mr. Benton and I were in contact with each other and in constant contact with the court awaiting the decision. There was some delay in submitting our pretrial materials. We were told that it wasn't necessary at that time, but we were in constant contact with the court, although there wasn't an official motion to continue on pending. If I understand your argument correctly, counsel, on your causation question, you're not arguing any kind of collateral estoppel or issue preclusion based on the resolution of the 2008 decision. That is correct. That's a separate claim, but you're arguing in essence we did the same thing both before and after the protected conduct. That's exactly right. Okay. That's exactly right. And because they made the same decision before, then the lawsuit has no bearing on their decision making, and he cannot establish causation. And there's some cases cited in our brief that supports that analysis. For example, there's a case if an employee was disciplined for conduct before the protected activity and then ultimately terminated for that same conduct, then the employee cannot establish causation. All right. Thank you. Thank you, Ms. Bakers. For all of these reasons, we would ask that you affirm the decision. Thank you. How much time does he have? One minute. One minute. Mr. Benton. Thank you. With respect to the negative beliefs that Dr. Rayford allegedly had, Dr. Rayford testified that he had no animosity toward Wexford. The very reason why he applied for the site medical director position after Wexford was awarded the contract was because he had no animosity and he wanted to stay in that position. Is there a dispute about whether he attacked Wexford management in that July 2000 phone call or whether he sent the letters highly critical of Wexford to public officials? There's no debate that Dr. Rayford expressed his concerns about Wexford in the July 2005 telephone conversation. There is some dispute as to how he presented himself in that conversation. Now, Dr. Rayford would tell you that he said he was treated like a dog. Those are his exact words. But the other thing that I think is important is that Dr. Rayford was exercising or utilizing an open-door policy. I mean, it would be disingenuous at best to criticize and or discipline an employee because he's exercising an open-door policy. It seems to me that if a company is trying to be fair and reasonable, that they would at least listen to the conversation and maybe investigate his allegations. That didn't happen. We believe that there's enough facts to substantiate a pretext, and we'd ask that you take it into serious consideration and remand it back to me. Thank you, Mr. Benton. Thank you to both counsel. We'll take the case under advisement. Thank you. Next case, U.S. v. Taylor.